UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARIANNE DEROO,

      Plaintiff,

vs.

UNUM LIFE INSURANCE
COMPANY OF AMERICA,

      Defendant.

_____/

Civil Action No. 18-CV-11216

HON. BERNARD A. FRIEDMAN

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT AND DENYING DEFENDANT'S MOTION FOR JUDGMENT

This matter is presently before the Court on cross-motions for judgment[1] [docket entries 17 and 18]. Each side has responded to the other's motion. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide these motions without a hearing.

***Background***

Plaintiff has brought this action under 29 U.S.C. § 1132(a)(1)(B) to challenge defendant's decision to stop paying her long-term disability ("LTD") benefits under a group insurance policy issued by plaintiff's employer, Beaumont Hospital. Defendant, the plan administrator, has counterclaimed for reimbursement of a portion of the LTD benefits it allegedly overpaid due to the fact that plaintiff has been awarded Social Security disability insurance benefits

---

[1] In *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring), the Sixth Circuit held that when deciding a case such as this, the Court "should conduct a *de novo* review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly." As this Court has noted, "[c]ourts do not use summary judgment procedures for deciding [ERISA] benefit claim denials; rather, parties can file cross motions for judgment on the administrative record . . . ." *Zack v. McLaren Health Advantage, Inc.*, 340 F. Supp. 3d 648, 655 (E.D. Mich. 2018).

which, under the policy, are considered income that must be deducted from the LTD benefits.

The parties agree that the Court's review is *de novo*. *See* Def.'s Br. at 12; Pl.'s Br. at 12-13. "When conducting a *de novo* review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998). This standard of review applies "with respect to both the plan administrator's interpretation of the plan and the plan administrator's factual findings." *Id.* The review "is without deference to the decision or any presumption of correctness, based on the record before the administrator." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990).

Having carefully reviewed the 1,955-page administrative record (hereinafter "AR"), as well as the parties' lengthy briefs, the Court finds and concludes that plaintiff is entitled to LTD benefits under the policy and that defendant's termination of those benefits was contrary to the policy.

Under the policy, plaintiff is entitled to LTD benefits if, due to sickness or injury, she is under the regular care of a physician and is "unable to perform the duties of any gainful occupation for which [she is] reasonably fitted by education, training or experience"[2] (AR at 121). The policy defines "gainful occupation" as "an occupation that is or can be expected to provide you

---

[2] The policy defines disability differently during the first twenty-four months of payments. *See* AR at 121. During that period of time, a claimant is disabled if "you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury." *Id.* In the present case, defendant has paid LTD benefits to plaintiff for more than twenty-four months, i.e., from April 14, 2012 (AR at 275) to October 19, 2016 (AR at 1725). Therefore, as the parties agree, the definition of disability that must be applied in resolving the instant dispute is the one that asks whether the claimant can "perform the duties of any gainful occupation for which [she is] reasonably fitted by education, training or experience."

with an income within 12 months of your return to work, that exceeds . . . 60% of your indexed monthly earning, if you are not working" (AR at 139).

***Procedural History and Record Evidence***

Plaintiff applied for LTD benefits in April 2012 due to "left lower extremity lymphedema" (AR at 49). Plaintiff worked at Beaumont Hospital as a "Clinical Nurse II," a full-time registered nurse ("RN") position that involved providing patient care (AR at 67, 88). Plaintiff had stopped working in October 2011 (AR at 88) due to the pain and swelling in her left leg which had begun in 1994 but had "progressively gotten worse in past year" (AR at 92). Plaintiff indicated that she could not continue working because she was "unable to stand/sit for prolonged periods of time; increase in pain/swelling with activity" (AR at 93).

In June 2012, defendant approved the claim, finding that plaintiff's disability began in October 2011 and that she was "unable to perform the material and substantial duties of your occupation due to the symptoms related to your medical condition of Lymphedema of the left leg" (AR at 276). One of plaintiff's treating physicians, Dr. Justin Riutta, M.D., opined in April 2012 that plaintiff's lymphedema caused her "significant restrictions with standing and walking which preclude her from return to work" and that "[s]he will be off work for the next three months" (AR at 188). Another of plaintiff's treating physicians, Dr. Cordell Yoder, M.D., opined in June 2012 that plaintiff "is unable to stand or keep leg in a dependent [sic] [for more than] three minutes" (AR at 249). Based on the opinions and records of these physicians, defendant agreed that plaintiff was "precluded from performing the material and substantial duties of her occupation" (AR at 270). However, defendant intended to contact plaintiff "in approx 2 months to monitor her response to treatment as prognosis is unclear at this time." *Id.*

3

In August 2012, defendant asked plaintiff to apply for Social Security disability insurance benefits (AR at 329). Plaintiff did so, and in July 2014 an Administrative Law Judge ("ALJ") decided the claim in plaintiff's favor (AR at 687-92). The ALJ also found that plaintiff's disability onset date was January 25, 2012 (AR at 692).

In the meanwhile, in April 2014, defendant terminated plaintiff's LTD benefits on the grounds that "you are able to perform the duties of other gainful occupations" (AR at 655). By this time, defendant had paid LTD benefits for 24 months and therefore the stricter definition of disability now applied. Defendant believed that plaintiff was capable of performing full-time sedentary work in "Nurse Triage" or "Nurse Consulting" positions. *Id.* Plaintiff appealed this decision and, ten months later, defendant reversed itself and reinstated plaintiff's LTD benefits (AR at 1143-45). In a February 2015 letter to plaintiff's attorney, defendant stated that "[t]he information that was submitted on appeal supports [that] your client remains disabled under the policy," based, in particular, on the ALJ's favorable decision and on Dr. Riutta's and Dr. Yoder's "opinions of your client's functional capacity" (AR at 1143).

In October 2016, defendant again decided that plaintiff was not disabled under the policy because "significant improvements in her level of functional capacity" enabled her to work as a Triage Nurse or Medical Claims Review Nurse, sedentary jobs that "would allow for elevating her leg at waist level intermittently during breaks" (AR at 1726-27). Defendant found improvement in plaintiff's condition because in 2016 she was wrapping her leg two to three times per week, compared to three to four times per week in 2014; recent records showed that plaintiff "is attending fitness classes and walking"; and recent "findings reflect normal tone, gait and range of motion" (AR at 1727-28). In July 2017, defendant rejected plaintiff's appeal of this decision (AR at 1912-

20).  Regarding plaintiff's need to elevate her leg, defendant found that "the suggested alternative occupations identified above would be compatible with her stated need to 1) elevate her left leg to waist level for 30 minutes during the workday, which can be accomplished during prescribed lunch breaks and/or 2) elevate the leg at waist level intermittently during breaks" (AR at 1915).

In accordance with its obligation to "take a fresh look," *Wilkins*, *supra*, the Court shall summarize the relevant portions of the voluminous record in some detail.

***Plaintiff's Statements***

In September 2012, in response to inquiries by defendant, plaintiff described her usual daily activities as follows:

> On a usual day I have a shower in the morning followed by a 30-40 minute session of manual lymphatic drainage (MLD) performed by myself.  From there I don a compression garment.  I am only able to do light housekeeping provided I get frequent rest periods to elevate my leg and perform lymphatic massage.  In the evenings I perform another round of MLD followed by a complex wrap of short stretch bandaging and compression foam.  This is worn at least 6 hours each evening with light range of motion exercises recommended by physical therapy.

(AR at 348).  Asked what "needs to occur before you can return to work," plaintiff wrote:  "Prior to my return to work, the swelling and pain need to improve.  I am unable to walk long distances, unable to run, unable to put pressure on my leg such as lifting and bending and kneeling.  Currently I require frequent rest period to elevate and massage my leg" (AR at 349).

In the "function report" plaintiff completed in October 2012 as part of her application for Social Security disability insurance benefits, plaintiff indicated that she is "unable to sit, stand, squat, kneel or walk for any period of time.  Due to the pain and discomfort of this condition I require frequent rest periods with elevation of my leg" (AR at 792).

5

In February 2014, plaintiff responded to a telephone inquiry from defendant by indicating that she "is able to drive, but only short distances and that she is only able to sit for 30 minutes max before she has to elevate her leg due to pain and swelling" (AR at 585). Plaintiff further indicated that she "is able to do light household chores and takes brakes [sic] while doing same because she is not able to be on her feet for any prolonged period and will sit and elevate her leg as needed." *Id.* Similarly, in April 2014, plaintiff told defendant that her symptoms were "all the same with pain and swelling if she is on her feet for any length of time" and that "sitting causes problems and she will elevate her leg to heart level and changes positions freq from walk/stand to sit" (AR at 590).

In August 2016, in response to a written inquiry from defendant, plaintiff indicated that she could not return to work because "[p]ain and swelling prevent me from activity. I need frequent breaks and elevation for my leg" (AR at 1448).

In February 2017, plaintiff told vocational counselor James Fuller that "my pain is really severe, it goes to an 8 even with medication" and that she needs to "elevate my left leg throughout the day, a pillow under it at night, the swelling is terrible, the range of motion is terrible" (AR at 1794).

### The ALJ's Decision

In his July 2014 decision, ALJ J. William Callahan found plaintiff's severe impairments to be lymphedema, depression, and obesity, and her residual functional capacity ("RFC") to be, in addition to other limitations, for "light work . . . except: the claimant must elevate her left lower extremity to waist level for 30 minutes during the workday" (AR at 689). The ALJ summarized the medical evidence of plaintiff's lymphedema as follows:

The record shows a history of left leg pain and swelling dating back to 1994. These symptoms began worsening in October 2011. However, on January 25, 2012, the claimant was found to have marked edema in the left lower extremity, despite compliance with her prescribed treatment of compression, elevation, and decongestive physical therapy. Subsequent progress notes document the claimant's aching and heavy leg pain. The claimant's prescribed treatment also includes a narcotic pain reliever.

The claimant receives extensive treatment from Justin Riutta, M.D., an acute pain management specialist, who recommended that the claimant remain off work until achieving full decongestion of her left lower extremity to avoid worsening symptomatology. At a follow-up in June 2012, Dr. Riutta indicated that "significant restrictions" with standing and walking precluded the claimant's return to work. Specifically, Dr. Riutta began the claimant's walking regimen at 10 minutes of walking per day. However, in July 2012, the claimant [sic] symptoms worsened. Dr. Riutta reported that the claimant had a progression of fluid that was resulting in gait dysfunction, pain, and generalized weakness in the left lower extremity. Diagnostic testing performed in August 2012 confirmed the abnormal lymphatic flow in the claimant's left leg.

In October 2012, Dr. Riutta recommended a daily walking regimen of five minutes per day, increasing one minute per week. He also indicated that the claimant could not stand more than 15 minutes at a time before exacerbating her edema. The record continues to show consistent treatment with Dr. Riutta. Most recently, in October 2013, Dr. Riutta reported that the claimant was experiencing pelvic pain with walking that was likely due to the weight her of [sic] left leg. Dr. Riutta observed that the claimant continued to have pronounced lymphedema that limited the claimant's ability to stand and walk. In addition, Dr. Riutta recommended that the claimant remain off work for an additional six months. In December 2013, the claimant was evaluated by Moises Alviar, M.D., a consultative examiner, who observed continued marked swelling in the claimant's left lower extremity.

(AR at 690; citations to exhibits omitted). Based on the medical evidence and the other evidence of record, including the testimony of a vocational expert, the ALJ concluded that plaintiff is disabled under the Social Security Act because "there are no jobs in the national economy that the individual

could perform" (AR at 692).  The ALJ recommended that plaintiff's case be reviewed in twelve months because "[m]edical improvement is expected with appropriate treatment."  *Id.*

***Plaintiff's Treating Physicians, Drs. Riutta and Yoder***

### Dr. Riutta

In July 2012, Dr. Justin Riutta, M.D., indicated that plaintiff could not sit for extended periods, that she "has weakness and pain in left lower extremity and gait dysfunction," and that her leg is wrapped "23 hours per day" (AR at 307).  He noted that plaintiff "has been attempting to increase her activity and is able to walk one mile three times per week," that she could not return to work, and that "she will be off work for an additional three months" (AR at 310).

In October 2013, Dr. Riutta opined that plaintiff could not do sedentary work on a full-time basis because "she is not at a capacity that she can work at an occupation that requires her to be on her feet regularly"; he also commented that plaintiff is "currently off work for 6 months and will likely require long term disability and not be able to return to her work as a nurse" (AR at 499-500).  Dr. Riutta noted that plaintiff "has been very diligent with her wrapping regimen and wrapping up to four to five times per week" (AR at 503).

In December 2013, Dr. Riutta informed defendant that

> [t]he primary issue with Ms. Deroo's lymphedema is that it is a
> swelling disorder that is aggravated by any dependent situation [sic]
> in which the leg is hanging down.  Lymphedema is known to be
> aggravated by conditions in which patients sit for long periods of
> time without capacity to elevate the leg.  Therefore, it is likely that
> her situation performing sedentary work, even if it was desk work,
> would likely aggravate her condition.  Ms. Deroo also has severe
> swelling of the lower extremity which limits . . . capacity for her to
> ambulate and this limits her capacity to function at her prior career as
> a nurse.  Therefore, I feel that she does have full disability and she
> has limited capacity to work at this time because of her underlying
> lymphedema disorder.

8

(AR at 570).

In April 2014, Dr. Riutta repeated his opinion that plaintiff could not do full-time sedentary work because "[l]ymphedema is known to be aggravated by conditions in which patients sit for long periods of time without capacity to elevate the leg. Desk work would most likely aggravate her condition. . . . This swelling also limits her capacity to ambulate" (AR at 600-01). Further, Dr. Riutta opined that plaintiff had reached maximum medical improvement (AR at 601). Later that month, in response to an inquiry from defendant, Dr. Riutta indicated he agreed that plaintiff could do sedentary work that "allow[ed] for changing position and posture from sitting for brief intermittent periods of standing/walking [sic] throughout the workday" and "for periods of elevating one's foot approximately 1 foot for intermittent periods" (AR at 634-35). In office notes that month, Dr. Riutta indicated that plaintiff "continued to wrap her leg three to four times per week" and that "[s]he states that she is not performing any regular exercise at this point" (AR at 1439). In September 2014, Dr. Riutta noted that plaintiff "continues to wrap four to five times per week," that use of a recumbent bicycle had helped with the swelling, and that "[s]he continues to be disabled from long term standing . . . because of the progression of her lymphedema" (AR at 1437-38).

In a letter to defendant dated November 2014, Dr. Riutta stated:

> Your letter of April 14th asked if [plaintiff] could work at a job that allowed her to elevate her foot approximately one foot for intermittent periods. She cannot. Elevating her leg one foot off the ground is inadequate and would provide her no benefit whatsoever. Swelling of the leg only reacts positively when the elevation is at least at waist level, preferably heart level, throughout the day. I realize that I indicated she could work with one foot elevation but that was an error on my part.

(AR at 1027).

In a "to whom it may concern" letter dated November 2014, Dr. Riutta further

explained:

> In documents forwarded to me in early 2014, the insurance carrier inquired as to whether Ms Deroo could perform a sedentary occupation. I felt that Ms. Deroo could perform a sedentary occupation as long as elevation of the leg was allowed. In a document on April 16, 2014, a document was forwarded to me that I signed which indicated that the elevation of the leg would only need to be one foot above the ground. After review of this document . . . I find that this is erroneous. The lymphatic system and lymphatic swelling associated with lymphedema results in severe swelling in the lower extremity. In order to provide a force to eliminate progressive fluid accumulation when upright, the leg has to be elevated above the waist. The primary drainage from the lower extremity is in the inguinal lymph node bed and in the abdominal lymphatics. Therefore, the leg would need to be elevated above this level in order to accommodate her current physical impairments. Therefore, my current recommendation is that if Ms. Deroo was to find an occupation that was sedentary in nature, it would require elevation of the leg above the waist in order to accommodate her current lymphedema disability.

(AR at 1442).

In June 2015, Dr. Riutta noted that plaintiff "has remained stable," that she was

"attempting to walk 2-3 times per week up to 20 minutes," and that she "has been wrapping the leg

2-3 times per week" (AR at 1435).

In January 2016, Dr. Riutta noted that plaintiff "attempted to increase her activity

level by going to fitness classes twice per week" (AR at 1432). He also noted plaintiff's "normal

non-antalgic gait pattern" and

> 1. Left lower extremity lymphedema primary in nature continue with wrapping twice per day and focus on weight maintenance and regular exercise. . . .
> 2. Left sacroiliac joint dysfunction related to weight to left lower extremity continue to monitor.
> 3. Follow-up in 6 months

(AR at 1434).  At the six-month follow-up appointment in July 2016, Dr. Riutta noted that plaintiff's

"overall clinical status is remained [sic] stable.  She continues to wrap the leg 2-3 times per week

and wears knee-high and thigh-high stockings to control swelling" (AR at 1429).  Under "gait," he

noted "decreased hip flexure function the left with walking" [sic] (AR at 1431).  He concluded by

noting:

> 1. Left lower extremity primary lymphedema overall stable without
> complication.  Continue decongestive wrapping 2-3 times per week
> and wearing compression garments during the day.
> 2. Left hip flexor dysfunction and left sacroiliac dysfunction focus on
> a daily walking and daily knee raises to maximize functional capacity
> reduce pain [sic]
> 3. Disability currently she is restricted to sedentary activity based on
> her physical impairments related to her primary lymphedema
> 4. Follow-up 1 year

*Id.*

In September 2016, in response to a written inquiry from defendant, Dr. Riutta

indicated that plaintiff could not do light work because she is "unable to stand or walk for extended

periods" due to her severe lymphedema (AR at 1480).  Two weeks later, in response to another

written inquiry from defendant, Dr. Riutta indicated that plaintiff could do sedentary work that

"would allow for positional changes and elevating the leg at waist level intermittently during breaks"

(AR at 1696-97).

In March 2017, one of Dr. Riutta's colleagues, Dr. Amish Patel, D.O., saw plaintiff

for her "recheck appointment" (AR at 1843).  He noted that "[s]he tells me the lymphedema is

unchanged and she continues to do the wrapping technique."  *Id.*  Dr. Patel found plaintiff's gait to

be "normal without any imbalance" (AR at 1844).

### Dr. Yoder

In September 2013, Dr. Cordell Yoder, M.D., indicated that due to her "massive lymphedema" plaintiff "is unable to stand for modest periods of time or sit, without keeping leg elevated" (AR at 484).

In October 2013, Dr. Yoder indicated in response to an inquiry from defendant that plaintiff could do sedentary work but, somewhat incongruously, that she "likely" would "have work capacity" in 18-36 months (AR at 532-33). One week later, Dr. Yoder responded to this inquiry a second time, again indicating that plaintiff could do sedentary work "[h]opefully within 1 year" (AR at 550-51).

In a letter to defendant dated September 2014, Dr. Yoder indicated he wished to clarify his October 2013 opinion:

> I did indicate Ms. DeRoo *could* qualify at a sedentary functional work capacity based on your definition. However, I also indicated that I was unable to determine exactly *when* she would be able to sustain that work capacity. I was hopeful that she could reach that capacity in 18-36 months from October, 2013 based on my response on the second page of the form.
>
> Further, because of my patient's constant swelling of her affected leg she needs to elevate it at waist level or higher a good deal of the day. Your definition of sedentary capacity fails to take that into consideration. I do not see how you or your examiners could determine that this woman could do some type of work when she has the equivalent of a "tree trunk" for a leg. Her symptoms are only relieved by compression and elevation which she must engage in a great majority of the day.
>
> Based on my long history of treating Ms. DeRoo, I appreciate your review of my clarification . . . . It was my opinion then and is now, that she cannot currently handle working at a sedentary functional capacity.

(AR at 697) (emphasis in original).

In December 2015, Dr. Yoder noted that plaintiff described her condition "as severe

and unchanged. Current treatment includes elevation of the legs and use of compression stocking(s)" (AR at 1673).

In May 2016, Dr. Yoder noted that plaintiff was "walking several times weekly" and that her gait was abnormal (AR at 1368-69). He also noted plaintiff's "[c]hronic continuous use of opioids" and his prescription, among other medications, for hydrocodone-acetaminophen (5-325 mg) (Vicodin) "every six hours, as needed." *Id.* Dr. Yoder has prescribed this narcotic pain medication, in the same frequency and dosage, or higher, uninterruptedly since at least March 2012 (AR at 538, 807, 812, 901, 977, 1389-1412, 1844, 1848, 1857, 1902).

In July 2016, in response to a written inquiry from defendant, Dr. Yoder again opined that plaintiff is not able to do light or sedentary work (AR at 1463-64). In September 2016, in response to another written inquiry from defendant, Dr. Yoder opined that plaintiff cannot do sedentary work that "allow[s] for positional changes and elevating the leg at waist level intermittently during breaks" because "[p]atient with severe lymphedema & chronic pain creating/causing inability to work effectively" (AR at 1519-20).

According to one of defendant's medical consultants, Dr. Jerry Beavers, M.D., on "11/15/16 Dr. Yoder reported edema was severe and unchanged requiring leg elevation with 'no significant improvement since initial disability' and no success increasing mobility over the last year" (AR at 1902).

***Consulting Examining Physician, Dr. Alviar***

In December 2013, plaintiff was examined by Dr. Moises Alviar, M.D., at the request of the Social Security Administration (AR at 977). Dr. Alviar diagnosed "[s]evere lymphedema in the left lower extremity," depression, and obesity, and opined that during an eight-hour work day

plaintiff could sit for a total of two hours, stand for a total of one hour, and walk for a total of two hours (AR at 985).

***Defendant's Non-Examining Consulant, RN Ainscough***

In September 2016, Deborah Ainscough, R.N., reviewed plaintiff's medical records at defendant's request (AR at 1494-98). She concluded that plaintiff "would be able to wear her compression garments daily and elevate her LLE at or above waist level intermittently throughout the day during breaks along with positional changes as needed" (AR at 1498).

***Defendant's Non-Examining Consulting Physicians, Drs. Bartlett, Shepherd, Sentef, and Beavers***

In January 2015, one of defendant's consulting physicians, Dr. Chris Bartlett, M.D., reviewed plaintiff's medical records and the ALJ's decision. He concluded that plaintiff "may lack predictable and sustained full-time (8-hour) functional capacity for sedentary or light (DOT) activities," but that "from 4/14/14 forward" the evidence did not rule out "capacity for 4 hours per day of sedentary or light (DOT) activities" (AR at 1076).

In October 2016, defendant's medical consultants, Dr. A. Catriona Shepherd, M.D., and Dr. Joseph Sentef, M.D., reviewed the medical records and opined that plaintiff is not precluded from doing sedentary work that "would allow for positional changes and elevating the leg at waist level intermittently during breaks" (AR at 1711, 1713).

In June 2017, another of defendant's consulting physicians, Dr. Jerry Beavers, M.D., reviewed the medical records and reached the same conclusion (AR at 1902). However, Dr. Beavers also found "that the record reveals no significant and lasting improvement since June, 2016. The insured's symptoms have continued largely unchanged and she has continued to require the same treatment for her severe LLE lymphedema as well as additional treatment for low back pain" (AR

at 1901). On this point, he elaborated as follows:

> The following chronologies illustrate her failure to improve:
>
> 1/7/16 she was wrapping the leg twice per week. There was no decrease in the frequency at which this process was required. 7/8/16 Dr. Riutta reported she had remained stable since 6/25/15 evaluation and was still wrapping 2-3 times per week. This frequency continues to the present.
>
> On 5/10/16 Dr. Yoder indicated exam showed marked non-pitting edema in the LLE, and abnormal gait due to sacroiliitis. 7/8/16 Dr. Riutta reported LLE circumferences were 50% greater than RLE. 11/15/16 Dr. Yoder reported edema was severe and unchanged requiring leg elevation with "no significant improvement since initial disability" and no success increasing mobility over the last year. 3/13/17 Dr. Patel reported lymphedema unchanged. On 4/11/17 she continued to have over 10 cm asymmetry.

(AR at 1902). Dr. Beavers also noted, but did not directly address, the effect of the wrapping of

plaintiff's leg on her ability to bend that leg:

> They [plaintiff and her attorney] indicate Ms. DeRoo has to wrap her leg 2-3 times per week. The wrapping stretches from her groin to her toes and significantly limits movement.
> Photos and video from April, 2017 show a quite swollen left leg and the insured walking stilt-like with the leg copiously wrapped from pelvis to toes, walking independently with a waddling gait about ten feet without being able to bend the left knee.

(AR at 1901).


***Plaintiff's Vocational Consultant, James Fuller***

In September 2014, at plaintiff's attorney's request, plaintiff met with a rehabilitation

counselor, James Fuller (AR at 700). Plaintiff told Fuller that "I have to elevate my left leg, I

alternate it 15 minutes up, 15 minutes down, if it's up too long it goes totally numb, if it's down too

long there's pressure and pain, I have to do that throughout the day, usually putting it on the ottoman

with a pillow" (AR at 698). She also told Fuller that her medications – Cymbalta, Vicodin, and

Xanax – make her "very sleepy" (AR at 700). Based on Dr. Riutta's restrictions and plaintiff's

description, Fuller found plaintiff to be "unemployable" (AR at 701). Specifically regarding the 23

types of jobs available for an RN as listed in the Dictionary of Occupational Titles, Fuller noted that

plaintiff "could not pass the CPR test, and the taking of narcotic pain medication is clearly a factor

to be considered in any patient care type of employment." *Id.*

> In an addendum dated November 2014, Fuller stated:
>
> With regards to the "Activity" reporting from the long term disability
> carrier, specifically described ability to perform a nursing position
> with "occasional exertion up to 10 pounds, sitting most of the time,
> and brief periods of standing/walking . . . changing position and
> posture from sitting for brief intermittent periods of standing/walking
> throughout the work day . . . allow for periods of elevating one's foot
> approximately 1 foot for intermittent periods," I feel the need to
> comment. After thoroughly reviewing the various types of nursing
> and related jobs using transferable skills, there are no employment
> positions that would fit within that physical demand level. I have
> attached for your review the entire DOT listings for Registered Nurse
> positions, and, as you can see, the only jobs that are sedentary
> physical demand are consulting or administrative jobs. These require
> special training and credentialing beyond the level attained by Ms.
> DeRoo. The supervisor jobs, as you will note, are all minimally at
> the light physical demand level, and as I state in my report, Ms.
> DeRoo
> could not pass the CPR test, she is taking narcotic pain medication.
> Based on those two factors alone, she would not be considered for
> any type of nursing, be it sedentary, light or medium physical demand
> level.

(AR at 748) (ellipses in original).

### Defendant's Vocational Consultants, Gregor and Byard

In October 2016, one of defendant's vocational rehabilitation consultants, Carrie

Gregor, reported that from an educational standpoint plaintiff is qualified to perform the "Alternate

occupations of Triage Nurse and Medical Claims Review Nurse"[3] (AR at 1716). She also indicated that these are sedentary positions which "would allow for positional changes and elevating the leg at waist level intermittently during breaks." *Id.* In June 2017, another of defendant's vocational rehabilitation consultants, Richard Byard, stated that "the suggested alternative occupations would be compatible with the insured's stated need to 1) 'elevate her left lower extremity to waist level for 30 minutes during the workday' (this could reasonably accomplished [sic] during prescribed lunch breaks) and/or 2) 'elevate the leg at waist level intermittently during breaks'" (AR at 1908).

*Analysis*

As noted above, defendant concedes that plaintiff met the policy's less demanding definition of disability (i.e., "limited from performing the material and substantial duties of your regular occupation") from October 2011 until April 2014. Defendant also concedes that plaintiff met the policy's more demanding definition of disability (i.e., "unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience") from April 2014 until October 2016. Therefore, plaintiff's entitlement to LTD benefits during the five-year period from the onset of plaintiff's disability in October 2011 (minus a six-month waiting period) until October 2016 is not in dispute. Rather, the dispute in this case is whether plaintiff

---

[3] Gregor indicated that the "eDOT" numbers of these positions are 075.267-140 for Triage Nurse and 079.267-140 for Medical Claims Review Nurse. No detailed information about these occupations is contained in the record, e.g., the education and training required, and the duties and exertional level involved. Nor is the Court able to find any further, publicly available information about them based on these "eDOT" numbers. By contrast, vocational consultant Fuller attached to his November 2014 report a copy of the written descriptions of all of the RN positions recognized by the Dictionary of Occupational Titles, *see* AR at 750-52, and the positions of "triage nurse" and "medical claims review nurse" are not contained therein. Fuller indicated that the only sedentary RN jobs are in the areas of consulting or administration, and that they require training and credentials that plaintiff does not possess (AR at 748).

continued to be "unable to perform the duties of any gainful occupation for which [she is] reasonably fitted by education, training or experience" from October 2016 onward.

The Court finds and concludes that since October 2016 plaintiff has continued to meet the policy's "unable to perform the duties of any gainful occupation for which you are reasonably fitted" definition of disability because the record contains no credible evidence demonstrating the existence of any nursing jobs that could accommodate plaintiff's physical impairments. Defendant concedes that plaintiff's lymphedema prevents her from doing light-level work because the pain and swelling in her leg prevent her from engaging in extensive walking. The great weight of the evidence convinces the Court that plaintiff's lymphedema also prevents her from doing sedentary-level work (including sedentary work that would provide for a sit/stand option) because she has a clearly demonstrated medical need to elevate her left leg frequently and at will to waist level or higher, and the record contains no credible evidence that jobs exist for which plaintiff is qualified and which can accommodate this need.[4]

Defendant concedes that plaintiff is limited to at most sedentary work. It is unclear whether the two occupations defendant believes plaintiff could perform exist. *See supra* n. 3. But even assuming the positions of Nurse Triage and Medical Claims Review Nurse do exist, the Court finds based on vocational consultant Fuller's statement (AR at 748) that plaintiff lacks the professional qualifications to perform them.

Even assuming the Nurse Triage and Medical Claims Review Nurse positions exist

---

[4] Because the Court finds that plaintiff is entitled to LTD benefits based solely on her lymphedema, the Court need not, and does not, consider the extent to which her functional capacity is further reduced by her other physical and mental impairments (i.e., her depression, obesity, and low back pain) and by her daily, chronic use of narcotic pain medication.

and that plaintiff is educated and trained to perform them, and assuming further that plaintiff's daily use of hydrocodone is not disqualifying (as vocational consultant Fuller indicates), the Court would still find based on the great weight of the evidence that plaintiff cannot perform these jobs because of her need to elevate her left leg to waist or heart level frequently and at will. Defendant acknowledges that plaintiff must elevate her leg to waist level, but it would limit this need to "30 minutes during the workday" or "intermittently during breaks" (AR at 1908). However, the great weight of the evidence supports, and the Court finds, that plaintiff must elevate her left leg much more frequently than this.

Plaintiff has stated repeatedly that she must elevate her left leg "frequently" and "as needed" and "throughout the day." *See* AR at 348-49, 425, 585, 590, 792, 1448, 1794. In February 2014, plaintiff told defendant that she can sit for at most thirty minutes before having to elevate her leg to relieve the pain and swelling (AR at 585). In September 2014, she told vocational consultant Fuller that "throughout the day" she must "elevate my left leg, I alternate it 15 minutes up, 15 minutes down, if it's up too long it goes totally numb, if it's down too long there's pressure and pain" (AR at 698). Dr. Riutta likewise indicated in November 2014 that "[s]welling of the leg only reacts positively when the elevation is at least at waist level, preferably heart level, throughout the day" (AR at 1027). Similarly, Dr. Yoder stated in September 2014 that plaintiff must "elevate it at waist level or higher a good deal of the day" or "a great majority of the day" (AR at 697).

In September 2016, Dr. Riutta opined that plaintiff could do sedentary work that "allow[ed] for positional changes and elevating the leg at waist level intermittently during breaks" (AR at 1696-97). The Court gives this statement little weight. This opinion was not expressed in narrative form, but as a "yes" answer to defendant's written question as to whether plaintiff could

do sedentary work that offered various physical and mental accommodations. It is not apparent that Dr. Riutta intended to opine specifically on the frequency of plaintiff's need to elevate her leg, and the term "intermittently during breaks" was not defined in defendant's inquiry. Further, Dr. Riutta's "yes" answer that plaintiff could work under these conditions is inconsistent with his previous repeated comments that plaintiff cannot sit for extended periods, that the swelling of her leg is aggravated when "the leg is hanging down," and that leg elevation is necessary "[i]n order to provide a force to eliminate progressive fluid accumulation" (AR at 307, 600-01, 1442).

Further, Dr. Riutta's suggestion that "intermittent" leg raising is sufficient is contradicted by Dr. Yoder who, in September 2014, characterized plaintiff's swollen leg as a "tree trunk" and indicated that plaintiff could not do even sedentary work because she must elevate her leg "a great majority of the day" (AR at 697). Dr. Yoder repeated this opinion in September 2016 by answering "no" to the same inquiry sent by defendant to Dr. Riutta, with the added explanation (something not provided by Dr. Riutta) that plaintiff had "severe lymphedema & chronic pain creating/causing inability to work effectively" (AR at 1519-20).

As between Dr. Riutta's and Dr. Yoder's September 2016 opinions, the Court finds that of Dr. Yoder to be more persuasive because it is in line with plaintiff's statements, which have been consistent over time, and with that fact that plaintiff's condition has changed very little since her disability began. Dr. Riutta noted in April 2014 that plaintiff had achieved maximum medical improvement (AR at 601), and by mid-2016 he was scheduling follow-up appointments at just one-year intervals (AR at 1431). The records note that plaintiff's condition over time has been "stable" and "unchanged" (AR at 1429, 1435, 1673, 1843, 1902). Even defendant's medical consultant, Dr. Beavers, found that the records demonstrated "no significant and lasting improvements" and a

20

"failure to improve" from 2015 to 2017 (AR at 1901-02), a fact ultimately conceded by defendant in its July 2017 denial of plaintiff's appeal (AR at 1916) – despite having justified its decision to terminate benefits in October 2016 by pointing to alleged "significant improvements in her level of functional capacity" (AR at 1727).

Aside from Dr. Riutta's September 2016 opinion (which the Court rejects for the reasons indicated above), the only evidence that plaintiff may need to elevate her leg less frequently than she claims is the ALJ's finding, in his July 2014 decision, that plaintiff needed to elevate her left leg "to waist level for 30 minutes during the workday" (AR at 689). The Court rejects this finding because it is unsupported by any evidence. The ALJ cited no support for this aspect of his RFC assessment, and the Court is aware of none. Rather, the great weight of the evidence shows that plaintiff must elevate her leg at waist or heart level frequently and at will. And the only evidence specifically quantifying the frequency is plaintiff's statement that she does so every fifteen minutes (AR at 698). The Court finds that this level of frequency is supported by the evidence.

In sum, the Court finds and concludes that plaintiff is entitled to LTD benefits because the record contains no evidence that any jobs exist, for which plaintiff is "reasonably fitted by education, training or experience," which can accommodate plaintiff's need to raise her left leg, frequently and at will throughout the day, to waist level or higher. The Court specifically finds and concludes that the two jobs identified by defendant, i.e., those of Triage Nurse and Medical Claims Review Nurse, would not accommodate this need, as the only evidence in the record as to these jobs indicates that they would allow plaintiff to raise her leg to waist level much less frequently than she requires, i.e., "for 30 minutes during the workday" or "intermittently during breaks" (AR at 1908, 1915). Accordingly, the Court finds and concludes that defendant's decision to terminate plaintiff's

LTD benefits in October 2016 was contrary to plaintiff's entitlement under the policy. Accordingly,

IT IS ORDERED that plaintiff's motion for judgment is granted.

IT IS FURTHER ORDERED that defendant's motion for judgment is denied.

IT IS FURTHER ORDERED that plaintiff's LTD benefits are to be off-set by her Social Security disability insurance benefits, as required by the policy.[5]

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated: April 10, 2019
Detroit, Michigan

---

[5] Defendant has filed a counterclaim in this matter for reimbursement of $29,578.52 it allegedly overpaid plaintiff in LTD benefits due to plaintiff's receipt of Social Security disability insurance benefits, which, under the policy, are a source of income that must be deducted from the LTD benefits otherwise due. However, the Court notes that plaintiff, through her attorney, has admitted her responsibility to repay any such overpayment. *See, e.g.,* AR at 1261, 1272. The Court also notes that plaintiff has not responded to the portion of defendant's motion seeking judgment on its counterclaim. It therefore appears that plaintiff does not contest the application of the policy provision calling for LTD benefits to be off-set by her award of Social Security disability insurance benefits.